# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-737 (CJN)** |
| **v.** | : | |
| | : | |
| **JEFFREY WILLIAM HUBBARD,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jeffrey Hubbard to 45 days' incarceration, 36 months' probation, 60 hours of community service, $500 in restitution, and the mandatory $10 special assessment.

### I.       Introduction

Defendant Jeffrey Hubbard, a 47-year-old Army veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

Defendant Hubbard pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 45 days' jail, 36 months' probation, 60 hours of community

---

[1] Although the Statement of Offense in this matter, filed on November 17, 2022, (ECF No. 24 at ¶ 8) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

service, $500 restitution, and the mandatory $10 special assessment, is appropriate in this case because of Hubbard's aggressive conduct toward police, his threat to engage police in physical violence, his repeated disobedience of police commands, and his lack of remorse.  During the near hour that Hubbard spent inside the United States Capitol on January 6, he repeatedly positioned himself at the vanguard of rioters who violently attacked police officers.  Indeed, after witnessing several violent skirmishes between rioters and police inside the Crypt and the Statuary Hall Connector, Hubbard maneuvered himself to the front of a melee inside the Rotunda and threatened to fight officers there.  As a result of this threat and his proximity to the front lines, Hubbard was ultimately pepper sprayed in the face.  Hubbard knew his presence inside the Capitol was unlawful. After all, he climbed through a shattered window next to the Senate Wing Door to enter the building.  But it took getting pepper sprayed in the face to finally force Hubbard to leave.

The Court must also consider that Hubbard's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to both overwhelm police officers trying to prevent a breach of the Capitol and disrupt the proceedings.  Here, the facts of and circumstances of Hubbard's crime support a sentence of 45 days' incarceration and 36 months' probation in this case.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 24 (Statement of Offense), ¶¶ 3-9.

### Defendant Hubbard's Role in the January 6, 2021 Attack on the Capitol

Between January 1 and January 6, 2021, Hubbard traveled from Lincoln City, Oregon to Washington D.C. to attend the "Stop the Steal" rally.  He entered the Capitol building through a

shattered window next to the Senate Wing door at approximately 2:22 p.m., just nine minutes after rioters wielding weapons and stolen riot shields violently broke into that entrance.



*Image 1: Hubbard enters the Capitol building by jumping through a shattered window*

After briefly walking north, Hubbard turned around, walked back past the Senate Wing door, and entered the Crypt. There, rioters were clashing with police, who were trying to prevent the mob from overtaking the building. The rioters eventually surged past the vastly outnumbered police, enabling Hubbard to further penetrate the building and walk upstairs to the Rotunda.

Hubbard entered the Rotunda at approximately 2:25 p.m., and then walked south through Statuary Hall at approximately 2:28 p.m. There, he stopped to take photographs, which were not recovered from his phone.[2]

---

[2] Hubbard's phone does not appear to contain content from January 6, 2021. It is not clear whether Hubbard deleted this content or replaced his phone, but during the investigation, an acquaintance of Hubbard's informed FBI that Hubbard claimed to have cancelled his phone and started using burner phones.

At 2:31 p.m., Hubbard entered the Statuary Hall Connector – the hallway that connects Statuary Hall to the main entrance of the House Chamber.  Several police officers were stationed at the end of the hallway to prevent rioters from reaching the House Chamber.  As rioters filled the hallway, Hubbard jostled his way to the front lines as he joined the crowd in shouting "Stop the Steal."  The rioters on the front lines were accosting police and threatening to inflict injury, warning them that the officers downstairs had been injured, and shouting "Y'all are putting yourselves in harm's way," and "You just gotta stand down."  *See* Exhibit A at 20:50-21:50.[3] Directly in front of Hubbard, rioters were holding a wooden flagpole horizontally and using it force back the police.  *Id.* at 25:50- 26:30.



*Image 2: Hubbard standing at the front lines of a violent clash between rioters and officers outside the House Chamber*

After forcibly breaching the police line, rioters began to flood the hallways surrounding the House Chamber.  Hubbard and the mob pushed forward, past police, and approached the main entrance to the House Chamber.  There, Hubbard witnessed rioters attempt to violently break through the House Chamber doors as they chanted, "Stop the Steal."  *Id.* at 26:40-27:40.

---

[3] The government's sentencing exhibits have been uploaded and shared with the Court via USAfx.



*Exhibit A at 27:42: Hubbard joins the mob attempting to break into the House Chamber*

Just beyond the chamber doors, members of the House of Representatives were lying on the floor, donning escape hoods and gas masks as they sheltered in place.  Police had barricaded the doors with heavy wooden furniture, and they had their weapons drawn in case any rioters breached the doors.



*Image 3: Police draw their weapons as rioters try to break into the House Chamber*

Hubbard lingered around the hallways surrounding the House Chamber for approximately twenty minutes before returning to the Rotunda.  During that time, police officers repeatedly instructed rioters to leave.  At some point, a white gas appeared to fill the hallway – yet another sign to Hubbard and the rest of the rioters to leave the building.  Hubbard ignored the white smoke

and the police's commands to leave.  Instead, he tried to break into the House Chamber through a different door.



*Image 4: Hubbard tries to break into the House chamber as white smoke fills the hallway*

When he returned to the Rotunda at approximately 2:59 p.m., Hubbard could see a crowd of rioters squaring off against uniformed police officers.  Instead of leaving the Rotunda or exiting the building, Hubbard chose to join the fray.  As Hubbard maneuvered himself to the front of the mob, police attempted to push him back with their batons.  *See* Exhibit B, at 00:20.  Again, Hubbard refused to comply with police commands, and kept pushing forward.  *See* Exhibit C, at 11:15- (Open-source footage of the violent skirmish between police and rioters inside the Rotunda. Hubbard's bald head is visible at the bottom of the screen starting at approximately 11:30 of the video).



*Exhibit C at 12:01: Hubbard forcing his way to the front lines of the skirmish between officers and rioters inside the Rotunda.*



*Exhibit B at 00:23: Hubbard disobeying police officers as he forces his way to the front of the mob*

Upon reaching the front lines at approximately 3:09 p.m., Hubbard braced his arms and readied himself to fight.  See Exhibit B at 00:27.  He then shouted at the officers right before he was pepper sprayed in the face.  *Id.* at 00:26.



*Exhibit B at 00:27: Hubbard preparing to fight police inside the Rotunda*

After being pepper sprayed, Hubbard clutched his face and knelt to the ground.  Hubbard was helped to his feet by police, who escorted him out of the melee.  Hubbard immediately flushed his eyes out with water, and ultimately exited the Capitol building at approximately 3:16 p.m. through the East Rotunda Doors.  Hubbard spent a total of 54 minutes inside the Capitol building.

*The Charges and Plea Agreement*

On December 6, 2021, the United States charged Hubbard by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) (Entering and Remaining and Disorderly and Disruptive Conduct in a Restricted Building) and 40 U.S.C. §§ 5104(e)(2)(D) and (G) (Disorderly Conduct and Parading, Demonstrating, or Picketing in a Capitol Building).  ECF No. 1.  On December 8, 2021, law enforcement officers arrested him at his home in Lincoln City, Oregon.  ECF No. 5.  On December 15, 2021, the United States charged Hubbard by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF No. 8.  On November 17, 2022, pursuant to a plea agreement, Hubbard pleaded guilty to Count Four of the

Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  ECF No. 23.  By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.  *Id.*

### III.   Statutory Penalties

Hubbard now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building.  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors  weigh in favor of a sentence of 45 days' imprisonment and 36 months' probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Hubbard's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Hubbard, the absence of violent or destructive acts is not a mitigating factor. Had Hubbard engaged in such conduct, he would have faced additional criminal charges.

Hubbard actively encouraged violence against the police on January 6. Not only did he repeatedly position himself at the vanguard of the mob, but he also shouted at police and, at one point, attempted to fight them. Through his actions, Hubbard emboldened those around him to disobey police commands and further encroach on the police line. Moreover, the fact that Hubbard was pepper sprayed directly in his face shows just how close he got to police line and the threat that he posed to officers.

In his 54 minutes inside the Capitol, Hubbard witnessed at least three violent standoffs between rioters and police. If climbing through a shattered window wasn't enough of a sign that Hubbard should not have entered the Capitol building, then surely witnessing rioters use flagpoles to attack police officers should have been. But for Hubbard, it took getting pepper sprayed in the face to force him to finally leave the Capitol building.

Hubbard was not a passive observer, nor was he simply swept up with the crowd. He had plenty of time to rethink his actions and exit the building. He did not discourage violence against police, as some other rioters did; he embraced it. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 45 days' incarceration in this matter.

### B.  The History and Characteristics of Hubbard

As an Army veteran who served in combat zones in Kuwait and Iraq between 2005 and 2006, Hubbard should have known better than to enter the U.S. Capitol on January 6 and willfully disobey police commands.  PSR ¶¶ 45-46.  Given his training and experience, he was acutely aware of how threatening his and other rioters' presence inside the Capitol building was for police and lawmakers.  Yet he repeatedly positioned himself at the forefront of violent confrontations between rioters and officers, and at one point threatened to fight an officer.  This is particularly troublesome conduct for someone who swore an oath to support and defend the Constitution.

Hubbard also has a prior conviction for operating impaired, for which he was sentenced to nine months' probation.  *Id.* ¶ 24.  Hubbard is not employed, but collects over $5,000 in disability benefits per month.  *Id.* ¶¶ 47-51.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6[th] that caused those events to occur. And if people start to get the impression that you can do what happened on January 6[th], you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. At 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6[th] as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Unemployed and with limited community involvement, Hubbard does not appear to have in place the guardrails that would prevent him from engaging in political violence in the future. While he does have several serious medical conditions, those conditions existed before January 6, 2021, and they did not affect his ability to vault himself through a shattered window or engage in vigorous physical resistance against police officers for approximately an hour.

Moreover, in messages recovered from Hubbard's phone, Hubbard appeared to suggest that weaponry was needed to handle the presence of groups he disagreed with politically.  For example, in January 2016, in response to one of his contacts saying that Muslims had been plotting to impose Sharia law in America, Hubbard wrote: "That is why it's important to buy guns and pay for ammo with cash.  Trump 2016."  According to one of Hubbard's associates, in the months following January 6, 2021, Hubbard purchased ammo and a rifle, and stored guns inside his truck.  This purchase happened a few months after an October 21, 2020 text message to a friend, in which Hubbard commented: "This is why Muslims need to go back where they are from."

A sentence of 45 days' imprisonment will reinforce to Hubbard the impact that his actions had on this country and the consequences of political violence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4]  This

---

[4] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

Court must sentence Hubbard based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Hubbard has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).  "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences."  Consequently, Section

3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed,

and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his

exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.  This Court has now sentenced several misdemeanor defendants who were convicted of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  Within the spectrum of conduct that this Court has evaluated, Hubbard's conduct falls somewhere in the middle.  For example, Hubbard traveled a similar path inside the Capitol as Clifford Meteer. *See United States v. Clifford Meter*, Case No. 1:21-cr-00630-CJN, ECF No. 31 (Gov't Sentencing Memorandum).  Unlike Meteer, however, Hubbard did not leave the building when instructed.  Instead, he escalated his behavior by threatening to fight officers inside the Crypt.  Also, unlike Meteer, Hubbard was aggressive toward police and repeatedly confronted them.  That said, there are mitigating factors that distinguish Hubbard from Meteer, including his comparatively modest criminal history, and his lack of social media braggadocio about the events of January 6.  This Court sentenced Meteer to two months in jail and 36 months' probation.

Consider, also, defendant Bradley Rukstales, whom this Court sentenced to thirty days' imprisonment. *See United States v. Bradley Rukstales*, Case No. 1:12-cr-00041-CJN-5, ECF No. 140.  Hubbard, like Rukstales, was aggressive toward law enforcement when he approached the police line inside the Crypt and attempted to fight officers.  Like Rukstales, Hubbard chose to insert himself into the thick of the chaos instead of complying with officers' commands to leave.

As with Rukstales, officers had to exert considerable force to get Hubbard to leave, including by pepper spraying him directly in the face.  Unlike Rukstales, however, Hubbard did not issue any public statements of apology and has not yet expressed remorse for his actions.  This Court sentenced Rukstales to 30 days' incarceration.  *Id.* ECF No. 140.

Hubbard's conduct is also more troublesome than those defendants who received shorter terms of incarceration or home detention.  Compared to Suzanne Ianni, for example, Hubbard was much more aggressive and confrontational with police.  *See United States v. Suzanne Ianni*, Case No. 1:21-cr-00451-CJN (sentenced to 15 days in jail and 30 months' probation for a violation of 40 U.S.C. § 5104€(2)(D), Disorderly Conduct in a Capitol Building).  Hubbard also spent over twice as much time inside the Capitol as Ianni, and participated in not one, but at least two violent clashes against police.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[5]

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Defendant to 45 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution, and the mandatory $10 special assessment.  Such a sentence protects the community, promotes respect for the law,

---

[5] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally Appellee's Brief for the United States, United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law.  *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)). In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    <u>s/ *Hava Mirell*</u>
Assistant United States Attorney
CA Bar No. 311098
312 N. Spring St., Suite 1200
Los Angeles, CA 90012
Email: Hava.Mirell@usdoj.gov
Phone: (213) 894-0717

## <u>CERTIFICATE OF SERVICE</u>

On this 3rd day of February, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Hava Mirell*
Assistant United States Attorney
CA Bar No. 311098
312 N. Spring St., Suite 1200
Los Angeles, CA 90012
Email: Hava.Mirell@usdoj.gov
Phone: (213) 894-0717
