C. Renée Manes
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, OR 97204
Tel. (503) 326-2123
Fax (503) 326-5524
E-mail: Renee_Manes@fd.org
Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 1:21-cr-00737-CJN |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **JEFFREY WILLIAM HUBBARD**, | |
| Defendant. | |

## I. INTRODUCTION

Mr. Jeffrey Hubbard presents the following memorandum and accompanying exhibits for consideration by this Court at the time of his sentencing on February 10, 2023, based on his plea of guilty to a charge of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G).

For the reasons presented herein, a probationary sentence, along with the restitution obligation and the special assessment, are the most appropriate sentence. Such a sentence will be sufficient to punish Mr. Hubbard's conduct while not being harsher than necessary to accomplish the sentencing goals set forth in 28 U.S.C. § 3553(a), as required by *Kimbrough v. United States,* 552 U.S. 85, 101 (2007).

Mr. Hubbard understands the serious nature of the January 6th event, and contrary to the government's contention, he is remorseful for his conduct as he states in his letter to this Court which is provided as Exhibit 1.[1] This memorandum will provide additional information on who Mr. Hubbard is as an individual; discuss in more detail his conduct on January 6th; and, address the government's sentencing contentions.

## II. THE BACKGROUND OF JEREMY HUBBARD

Jeremy Hubbard is one of three children in the Hubbard family, and has lived in either Michigan or Oregon all of his life. He has led a simple life of dedication to his family and his country; a life which has been dramatically altered by the disabilities he has suffered ever since 2011.

Mr. Hubbard graduated from Carman-Ainsworth High School in 1994. *See* Exhibit 2, Diplomas. Mr. Hubbard pursued some advance training, receiving an

---

[1] Mr. Hubbard is working on his sentencing letter but, unfortunately, he experienced a medical event on Friday resulting in a period of hospitalization. The letter will be obtained and provided prior to the time of sentencing.

Associate in Applied Science/Automotive Technology in December of 2000, and worked in that field.

In 2004, Mr. Hubbard joined the United States Army. *See* Exhibit 5, Military Records (filed underseal). Mr. Hubbard served the United States in the combat zones of Kuwait and Iraq and received numerous commendations for his service, including the Army Commendation Medal, Army Achievement Medal, Army Good Conduct Medal, National Defense Service Medal, Global War on Terrorism Service Medal, Army Service Ribbon, Overseas Service Ribbon, Armed Forces Reserve Medal, and Combat Action Badge. *Id*. Mr. Hubbard was Honorably Discharged in 2006, after medical conditions made him unable to continue to serve in active duty.

In 2006, Mr. Hubbard underwent an emergency aortic aneurism repair. *See* PSR at ¶ 37; Exhibit 3, report of Kathryn A. Pekrul, LLP and Michael P. Hayes, Ph.D., Report for Disability Determination, at 2 (filed under seal). While he was unable to serve actively, Mr. Hubbard joined the Michigan National Guard in 2006, and continued to serve therein until 2011. *See* Exhibit 5, Military Records. He also continued to advance his education, and Mr. Hubbard obtained an Associate in General Studies degree in 2007, and an Associate in Liberal Arts degree in 2008. *See* Exhibit 2, Diplomas.

Unfortunately, Mr. Hubbard's health continued to deteriorate as complications developed with his prior heart surgery. A further aortic repair was necessary in June 2013. PSR at ¶ 37. The procedure did not go smoothly, and Mr. Hubbard suffered a

series of strokes and seizures that placed him in the ICU for ten days and the hospital for thirty days. Exhibit 3, Pekrul & Hayes Disability Report, at 2. Mr. Hubbard suffered a lack of oxygen to the brain during this time, and the seizures and strokes left him with significant cognitive impairment. *Id.*

Mr. Hubbard's current disabilities include "highly impaired cognitive abilities[.]" Exhibit 3, Pekrul & Hayes Disability Report, at 7; *see also* Exhibit 4, Report of William J. Laffrey, Jr., MA LLP at 2 (noting that "frontal lobe compromise is suggested") (filed under seal). Drs. Pekrul and Hayes confirm that Mr. Hubbard has "significant cognitive impairment including impaired short-term memory, long-term memory, concentration and focus;" he has "difficulty completing tasks" and "difficulty maintaining conversations due to memory and confusion, poor word retrieval, slow processing speed, difficulty understanding simple and complex instructions" and "poor reading comprehension." Exhibit 3, Pekrul & Hayes Disability Report, at 2.

Mr. Hubbard's impairments are also physical. He has "weakness on his right side and tingling in his left, arm, foot and leg." Exhibit 3, Pekrul & Hayes Disability Report, at 2. His gait is impacted and he often stumbles. *Id.* His speech is impaired and his enunciation is poor. *Id.* Finally, as an understandable result of his impaired cognition, physical infirmities, and difficulty communicating, Mr. Hubbard suffers from depression and extreme anxiety. *Id.*

As Drs. Pekrul and Hayes conclude, Mr. Hubbard is markedly impaired in all of his functional abilities, he is unable to maintain gainful employment, and his prognosis for any recovery is very poor. Exhibit 3, Pekrul & Hayes Disability Report, at 7.

At this time, Mr. Hubbard is unable to work and receives complete disability benefits through the Department of Veteran's Affairs and Social Security. PSR at ¶ 36. He lives with his mother and step-father, who are also disabled, and helps take care of them. Mr. Hubbard has a limited social life, as he continues to suffer from anxiety and depression.

### III. MR. HUBBARD'S CONDUCT ON JANUARY 6TH

Mr. Hubbard has followed former President Trump, and was concerned about the veracity of the election based on the information provided by President Trump. As a result of his cognitive limitations, Mr. Hubbard is not as capable of critical thinking and analysis as most individuals.

Mr. Hubbard attended the rally on January 6, 2021, and then went with the crowd into the Capital. Mr. Hubbard is not contending that he was entitled to enter the Capital, or that he believed it was open. However, he very much disputes the characterizations of his actions given by the government. The government's contentions that Mr. Hubbard willfully inserted himself into the front lines of the melee and then refused to follow any orders from law enforcement fail to acknowledge the realities of his cognitive disabilities; disabilities which left him

unable to process what all was occurring in the chaotic environment of the Capital that day. Even then, the video footage provided by the government does not show Mr. Hubbard being violent or fighting with law enforcement.

The video footage provided by the government as Exhibit A is part of the videos taken by a John Sullivan, who is charged in *United States v. Sullivan*, Case 1:21-cr-00078-RCL (D. D.C.). The video is almost forty minutes long, and Mr. Hubbard is seen only briefly. At roughly the 15:20 mark, Mr. Hubbard can be seen very briefly outside the Statutory Hall, after the filmographer climbs the stairs. Mr. Hubbard does not have any weapons, nor is he wearing any protective gear. At approximately 20:34, Mr. Hubbard is seen in a large crowd that is outside the entry to the House of Representatives, and the crowd is chanting "we want Trump." Over the next three minutes, there is filming of the crowd. Many individuals in the crowd are yelling, others are talking to the law enforcement officers. One individual with a megaphone repeatedly urges individuals to be calm and not engage in violence, telling them to "calmly and quietly" go in and sit down in the House Chambers. Mr. Hubbard is not seen yelling, nor is he carrying any weapons, nor wearing any tactical gear. At the 26:18, the crowd pushes further in and are in the hallway leading to a House door. For the next few minutes, there are occasional glimpses of Mr. Hubbard standing near the rear left door; as he is shorter than many individuals he comes in and out of view. The best views of Mr. Hubbard are around 31:24 and 31:33, where the side of his head is visible, with the best view at 31:46, when he is

briefly directly in front of the camera, and he is joining a chant of "break it down" but he is still not carrying any weapons nor handing weapons to others. At that point, the videographer leaves the area and follows the crowd around the House Chambers to another entry, which is the location where Ashli Babbit was shot, and that is seen on the video. While this is undeniably a very dramatic violent event, Mr. Hubbard is not with the crowd at that time. Instead, as the government's sentencing memorandum notes, he left the crowd and went another way. Government's Sentencing Memorandum at 6. The government contends that Mr. Hubbard is seen trying to break into the House, but what he is actually seen doing is trying to open a door – he is not kicking the door, or banging on the door with his fists, or using a weapon – all he is doing is trying a handle on a door. There is no evidence that he knew where this door led.

The government's Exhibit B appears to be a police body cam from clearing of the rotunda. The government contends that it shows him "squaring off against uniformed police officers" and "forc[ing] his way to the front of the mob." Government's Sentencing Memorandum at 6 and 7. This is inaccurate. What is shown is Mr. Hubbard standing in a group that is being approached by officers who are pushing individuals out of the Rotunda, he turns around, is pepper sprayed, and then kneels to the ground with his hands over his face. Mr. Hubbard does not have any weapons, he is not wearing any tactical gear, and he does not personally physically engage with the law enforcement.

The government's Exhibit C also shows the clearing of the rotunda. Mr. Hubbard is seen only very briefly, around the 11:25 mark, and thereafter there is period where the crowd behind is pushing forward and law enforcement are in a line pushing the rioters out. Mr. Hubbard does not have any weapons, he is not wearing any tactical gear, and he does not personally engage with any law enforcement. At the 14:56 mark there is an individual that might be Mr. Hubbard further back in the crowd, but it is unclear. Again, that individual does not have any weapons, he is not wearing any tactical gear, and he is not engaging in violence with law enforcement. From the rest of the video it appears that law enforcement is successfully clearing the Rotunda by pushing the crowd out, but Mr. Hubbard is not seen any further.

Nothing in the lengthy video exhibits submitted by the government show Mr. Hubbard personally engaging in violence against law enforcement; nothing in the videos shows him breaking any doors, windows or other property; the videos confirm that he was never armed and never wearing any tactical gear.

Mr. Hubbard was in the Capital for almost an hour. If Mr. Hubbard had wished to engage in physical violence with law enforcement or against property, there was ample opportunity for him to do so. If he had done so, there would be evidence of those actions. There is no such evidence.

## IV. THE GOVERNMENT'S COMPARISON CASES

The government cites three cases as comparisons to justify their recommendation of a custodial term for Mr. Hubbard. Those cases are readily distinguishable.

First, in *United States v. Meter,* Case No. 1:31-cr-00630-CJN, the defendant was seen carrying a large sign through the Capital and was physically pushed by law enforcement to force him to leave the building. *See* Clerk's Record 31, Government Sentencing Memorandum, at 7-9. Before and after the events of January 6th, the defendant repeatedly posted on social media, including posts denying that there was any violence and defending the rioters. *Id.* at 11-13. One year after participation in the riot, and while he was pending criminal charges, the defendant gave an interview to a news station maintaining that he had no regrets about participating in the riot and claiming that he had no alternative. *Id.* at 13. Prior to this event, the defendant had a 2013 felony conviction for tampering with evidence, yet at the time of his arrest he possessed ten different guns and rifles. *Id* at 14-15. There is absolutely no evidence that this defendant suffered from any disabilities.

Next is *United States v. Rukstales*, Case No. 1:12-cr-00041-CJN-5, and it is also distinguishable. While in the Capital, the defendant was seen throwing furniture, including in the direction of law enforcement. CR 130, Government's Sentencing Memorandum, at 5-6. The defendant refused to leave the Capital, and had to be forcibly removed and arrested by multiple officers. *Id.* at 10-12. The defendant did

issue statements of remorse post-arrest, however there is no indication that he suffered any cognitive impairments that might limit his ability to communicate.

The case of *United States v. Ianni*, Case No. 1:21-cr-00451-CJN, is also markedly different. First, the defendant organized transportation to the January 6th event for a large group of individuals. CR 54, Government's Sentencing Memorandum, at 2-3. While she was in the Capital for a fairly short period of time, she witnessed violence although not engaging in any herself, but did lead chants of those around her. *Id.* at 3-5. Post-January 6th, the defendant has: sought to fund raise off of her participation in the event; characterized the charges against her as "political prosecution;" and, posted on social media contending that the FBI was actively involved in causing the events of January 6th. *Id.* at 3 n.2 and 12-13. There is no indication that this defendant suffers from any cognitive or physical impairments.

In sum, all of the comparison cases cited by the government are individuals who were fully aware of their surroundings, options and choices on January 6th, and were able to process the chaos in which they found themselves. Mr. Hubbard is not one of those individuals. And after the events of January 6th there is no indication that Mr. Hubbard sought to justify his conduct, bragged about his participation, or attempted to fund raise off of his presence. The indications are that he was frightened by the events, and by the fact that he had been present.

## V. DISCUSSION OF A REASONABLE SENTENCE

In addition to the history and characteristics of Mr. Hubbard, 18 U.S.C. § 3553(a)(2) requires that a sentence also: (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (b) afford adequate deterrence to criminal conduct; (c) protect the public from further crimes by the defendant; and, provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Mr. Hubbard will never again commit such a crime – nor is he likely to commit any other crime. Neither factors (c) and (d) require a sentence of incarceration.

As for factor (b), the need to deter such conduct in the future, incarcerating Mr. Hubbard will not accomplish that objection. First, Mr. Hubbard will not engage in such conduct in the future. As for other individuals who are likely to do so – there are individuals who will follow the "Big Lie" and former President Trump, and they will not be deterred by Mr. Hubbard's incarceration – and possibly not even by their own.

As for (a), reflecting the seriousness of the offense, that is an important criteria. However, incarceration is not the only method of confirming those issues. The hearings before the Select Committee to Investigate the January 6th Attack on the United States Capital have helped educate the general public about what occurred that lead to these events, what occurred that day, and what has transpired thereafter.

It is such proceedings that will demonstrate how serious the behavior was of the various actors involved, and allow those who wish to learn from the events to do so.

As for teaching Mr. Hubbard himself of the seriousness of his conduct, that is a lesson that he is already learning. Mr. Hubbard has experienced extreme anxiety while addressing this matter, and he never wishes to be in a similar position again. Mr. Hubbard has complied, completely, with all requirements of his Pretrial Supervision, and he intends to comply with all requirements of his probation. Given his disability status and limited income, paying his portion of the restitution is a significant burden in and of itself. And there will always be a record that Mr. Hubbard was one of the individuals who joined an attempted insurrection on January 6, 2021; history will remember his actions and those of the other participants, and the collateral consequences from that participation are just beginning to be known.

## VI. CONCLUSION

In light of all of the information presented herein and the additional information to be discussed at the time of sentencing; and based on who Mr. Hubbard is and how he has lived his life on every day but January 6, 2021; a probationary sentence is sufficient to punish Mr. Hubbard for his conduct that day.

Respectfully submitted, this 6th day of February, 2023.

                                                                */s/ C. Renée Manes*  
                                                                C. Renée Manes  
                                                                Attorney for Defendant